**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**v.**                                                                                                    **No. 13-cr-2158 RB**

**EDWIN JUAREZ-RAMOS,**

    **Defendant.**

**MAGISTRATE JUDGE'S PROPOSED FINDINGS
AND RECOMMENDED DISPOSITION**

THIS MATTER is before me on Defendant Edwin Juarez-Ramos' Motion to Suppress Statements [Doc. 15], filed on July 18, 2013. In his Motion, Defendant argues that statements he made to Border Patrol Agents should be suppressed because they were made during custodial interrogation and were involuntary. The United States responded on July 30, 2013. [Doc. 19]. Defendant filed no reply, and the time for doing so has passed. Pursuant to the reference by the Court, [Doc. 21], I held a hearing on the Motion to Suppress Statements on August 28, 2013. [Doc. 24]. The Government called three Border Patrol Agents as witnesses and introduced exhibits. Defendant called no witnesses and offered no exhibits. Having considered the briefing, the evidence and argument presented at the hearing, the relevant law, and being otherwise fully advised in the premises, I find that Plaintiff's statements should not be suppressed. Defendant was not entitled to a *Miranda*[1] warning during the investigatory detention in the desert, and because those statements need not be suppressed, Defendants' argument regarding his statements

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

at the Border Patrol Station is moot. Accordingly, the motion is not well-taken and should be denied.

## PROPOSED FINDINGS

1. Kevin Taylor is a Border Patrol Agent ("BPA") with the United States Border Patrol. He is assigned to the Deming Border Patrol Station in Deming, New Mexico. BPA Taylor is fluent in both the Spanish and English languages.

2. On the evening of March 25, 2013, BPA Taylor was alone, conducting a routine patrol along the border between the United States and Mexico, in an area east of the Columbus, New Mexico Port of Entry.

3. At approximately 10:30 p.m., BPA Taylor received a call from a Radio-Video-Systems-Surveillance operator indicating that a group of three individuals was approaching the United States/Mexico international border, from the Mexican side.

4. From his location, approximately one-half mile east of the Columbus, New Mexico Port of Entry, BPA Taylor observed, through the use of night vision binoculars, a single individual on top of the pedestrian border fence, which separates the United States and Mexico.

5. After a short period, he saw the individual descend on the United-States side of the border fence. Over the course of about 15 minutes, BPA Taylor watched a total of three individuals enter the United States by climbing over the fence.

6. BPA Taylor waited a few minutes to give the individuals time to move farther into the United States. He then drove his vehicle eastbound on Border Road until he observed the individuals with his night-vision binoculars. He then exited his vehicle and, on foot,

began pursuing the three individuals, who were about 200 yards north of him, in the desert.

7. Once BPA Taylor was within earshot of the three individuals, he called out to them in Spanish. He told them that he could see them, and he told them to sit down where they were and wait for him.

8. BPA Taylor then approached the three individuals, including Defendant, whom he observed to be hiding in some desert brush.

9. BPA Taylor shined his flashlight on Defendant and the other two individuals and directed them to come out of the brush and to sit on the ground in a clear area.

10. BPA Taylor asked all three individuals if they were carrying any weapons. They responded that they were not carrying any weapons.

11. BPA Taylor then identified himself as a United States Border Patrol Agent. BPA Taylor then asked each individual, including Defendant, whether they possessed any documents allowing them to be present in the United States. Defendant replied that he did not possess any such documents.

12. BPA Taylor then asked each individual where they were from. Defendant replied that he was a citizen of El Salvador.

13. BPA Taylor then asked each individual whether they had crossed into the United States illegally, and each of them, including Defendant, responded that they had crossed into the United States illegally.

14. At no time during Defendant's encounter with BPA Taylor did BPA Taylor draw his weapon. BPA Taylor did not make any threats or promises to Defendant or his two

companions. At no time during this encounter did BPA Taylor make physical contact with any of the three individuals. BPA Taylor was the sole law enforcement agent present for this initial encounter, and it was only after Defendant had answered BPA Taylor's questions that an additional agent arrived on scene.

15. Once a second Border Patrol Agent arrived, the agents searched the three individuals and their belongings.

16. BPA Taylor then handcuffed Defendant to one of the other individuals and transported all three to the Deming Border Patrol Station.

17. Defendant was processed at the Deming Border Patrol Station by BPAs Ruben Gonzalez and Mark Sano. Both agents are fluent in English and Spanish.

18. BPA Gonzalez explained to Defendant his *Miranda* rights in BPA's Sano's presence. Around 1:15 a.m. on March 26, 2013, in the presence of BPAs Gonzalez and Sano, Defendant signed Border Patrol form I-214, a Spanish-language form, indicating that he understood his rights and chose to waive them. The agents also signed the form, which was admitted into evidence as Exhibit 1.

19. After Defendant signed the I-214 form, BPA Sano questioned Defendant in a well-lit room in the Border Patrol Station around 2:00 a.m. Defendant admitted that he had crossed the United States/Mexico border illegally around 10:00 p.m. on March 25, 2013. Defendant reported that he was a citizen of El Salvador and admitted to having a criminal history. He told BPA Sano that he intended to travel to Bakersfield, California to look for employment.

20. Neither BPA Gonzalez, nor BPA Sano made any promises or threats to Defendant. Both agents comported themselves professionally and calmly during the encounter with Defendant.

21. Defendant offered no witnesses or exhibits to refute the testimony of Agents Taylor, Gonzalez, and Sano. Based on their demeanor and manner of testifying, I found both agents to be credible, reliable witnesses.

## DEFENDANT'S ARGUMENTS

Defendant moves to suppress all of the statements he made to BPAs Taylor and Sano. [Docs. 15, 26]. He argues that he was arrested when "complied with [BPA Taylor's] orders by coming out of the bushes and sitting on the ground." [Doc. 26] at 3. He concludes that because BPA Taylor did not advise him of his *Miranda* rights before questioning him about his citizenship and immigration status, his responses should be suppressed. *Id.* at 3–4. Defendant further argues that the statements he made at the Border Patrol Station should be suppressed, too, because he BPA Taylor had previously questioned him regarding his citizenship and immigration status. *Id.* at 4–5 (citing *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1150 (10th Cir. 2006) (setting forth five factors that bear on whether *Miranda* warnings delivered midstream can be effective)).

## LEGAL STANDARDS AND PROPOSED CONCLUSIONS OF LAW

Whether a person is in custody for *Miranda* purposes depends on the type of the encounter with police. Of the three types of police-citizen encounters—voluntary cooperation, an investigatory detention under *Terry v. Ohio*, 392 U.S. 1 (1968), and a formal arrest—*Miranda's* custody element is triggered only in situations associated with formal arrests. In other

words, "[c]ase law is well established that a defendant is not in custody under either of the first two encounters and therefore *Miranda* warnings need not usually be given." *United States v. Griffin*, 7 F.3d 1512, 1516 (10th Cir. 1993) (citing *Berkemer v. McCarty*, 468 U.S. 420, 437–40 (1984)). "It is settled that the safeguards prescribed by *Miranda* become applicable [only when] a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer*, 468 U.S. at 440 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). Only then can it be said that a suspect is in custody.

Whether a suspect is in custody represents an objective determination. *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008) (citing 2 Wayne R. LaFave et al., Criminal Procedure § 6.6(c) (3d ed. 2007)). Courts, therefore, must determine whether "a reasonable person in the suspect's position would have understood the situation as the functional equivalent of formal arrest." *Id.* (internal quotation marks omitted). A reasonable person "does not have a guilty state of mind and does not have peculiar mental or emotional conditions that are not apparent to the questioning officer." *United States v. Hudson*, 210 F.3d 1184, 1190 (quoting *United States v. Erving L.*, 147 F.3d 1240, 1246 (10th Cir. 1998)).

"The determination of custody, from an examination of the totality of the circumstances, is necessarily fact intensive." *Griffin*, 7 F.3d at 1518. Courts thus avoid hard line rules and instead allow several non-exhaustive factors to guide them. First, courts consider "the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will." *Id.* Second, courts look at "the nature of questioning," where "prolonged accusatory questioning is likely to create a coercive environment from which an

individual would not feel free to leave." *Id.* Finally, by using the following helpful guideposts, courts check whether police dominate the encounter:

> [S]eparation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.

*Id.* at 1518–19. Although these factors are useful, courts emphasize that they must look to the totality of the circumstances and consider the police-citizen encounter as a whole, rather than picking some facts and ignoring others.

I find that under the circumstances, Defendant was held by BPA Taylor in an investigatory detention when BPA Taylor questioned him about his citizenship and immigration status in the desert. *See Terry*, 392 U.S. 1. The nature of the questioning was not prolonged. Defendant was not separated from his companions. Defendant was not isolated in a non-public questioning room; in fact, he was in the out-of-doors. Only BPA Taylor was present during the questions; no other agents were on scene. Although BPA Taylor had his sidearm, it remained holstered during the questioning. BPA Taylor was not required to advise Defendant of his *Miranda* rights when he questioned him about his citizenship and immigration status. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 881–82 (1975) (With reasonable suspicion that aliens are in in the country illegally, an officer conducting an investigatory detention "may question the [suspects] about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent

or probable cause.").[2]  Moreover, BPA Taylor was within his authority to question Defendant as to whether he had crossed the border illegally.  *See United States v. Salas-Garcia*, 698 F.3d 1242, 1248 (10th Cir. 2012) ("[T]he court must examine whether the investigative detention was . . . 'reasonably related in scope to the circumstances which justified the interference in the first place.'") (quoting *Terry*, 392 U.S. at 20)).

## CONCLUSIONS AND RECOMMENDATION

Because BPA Taylor had reasonable suspicion that Defendant had entered and was present in the United States illegally, he was within his authority to stop him and to question him.  Defendants' statements in the desert to BPA Taylor should not be suppressed.  Because Defendants' statements to BPA Taylor need not be suppressed, Defendants' argument regarding his statements to BPA Sano is moot.[3]

---

[2] Although at the time that BPA Taylor questioned Defendant, the agent likely had probable cause to arrest Defendant—after all, he had observed Defendant and his comrades climb over the border fence—probable cause should not be confused with custody.  The existence of probable cause does not require an officer to cease his investigation and arrest and *Mirandize* the suspect on the spot.  *United States v. Chavez*, 660 F.3d 1215, 1225 (10th Cir. 2011) (citing *Kentucky v. King*, 131 S. Ct. 1849, 1860–61 (2011)).

[3] Defendant offered no evidence to refute the Government's position that Defendant was given his *Miranda* rights before being questioned by Agent Sano.  Defendant's only argument regarding the questioning at the Border Patrol Station was that it was the "fruit of the poisonous tree," i.e., the questioning in the field by Agent Taylor.  Having found that the questioning by Agent Taylor did not violate Defendant's rights, the questioning in the station is rendered moot.

**IT IS RESPECTFULLY RECOMMENDED** that Defendant Edwin Juarez-Ramos' Motion to Suppress Statements [Doc. 15] be **DENIED**.

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN FOURTEEN DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition, they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any written objections with the Clerk of the District Court within the 14-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

_____
**STEPHAN M. VIDMAR**
**United States Magistrate Judge**